Good morning. My name is Cliff Marchick. I represent the appellant Fred Miscimarra. Your Honors, this case arises out of a summary judgment that was granted at the District Court level in Las Vegas, Nevada on two claims for relief that were presented. One for sexual harassment, in particular a hostile work environment claim, and the second for retaliation. Now, Fred Miscimarra was a well-experienced retail person. He had a bachelor's degree, and he was hired by Home Depot February 21, 2000. He started at some point thereafter. And while he was employed there, he was put under extensive sexual harassment by his immediate supervisor, department head Renee Brennan. Now, the organizational structure for Home Depot was there were sales associates. Miscimarra was one of those. There were five or six in the hardware department. Brennan was the department head of the hardware department, and then there were area supervisors. The area supervisor over the hardware department was a man by the name of Rick Welch. She was, Brennan that is, did numerous things, and I detailed those in my brief. I'm not going to restate those because they were pretty well detailed in there, but there were not only was it words that were to him, presented to him, but there was offensive touching. There was talking about the male genitalia in front of him with a coworker. There was incidents where she would squeeze herself between him and the railing, he being Fred Miscimarra, touch her buttocks on his genitalia. She touched his face, his chest, calling him various pet names such as stud man, stud boy, and big strong man. She did this on almost a daily basis there. That's what the record shows to you, Your Honor. When did he first object? He objected early on in the- Early on, when? Well, this started right at or near the time he started working, and in his deposition transcript, he said very early on. He did not provide a specific date, but he did state that he told her, hey, Renee, come on, we're working here, stop doing that. Did it stop him doing his job? Pardon me? Did it stop him doing his job? No, he was able to continue to perform his work there at Home Depot, but it was something that was definitely offensive to him all throughout his deposition. He refers to it was embarrassing, it was unwelcome, it was something that he most certainly did not want to put up with. All right, it was offensive, but was it anything more than that? This was a married man, Your Honor. This was conduct he had never undergone at any time during any of his employment. This was something he felt was offensive, and it was almost on a daily basis. This was not the harassment of a violent nature, but Title VII doesn't require it to be to that extent. This was not a sexual assault, but Title VII doesn't require that type of conduct. It requires that the environment be a severe and pervasive, hostile environment to an objective standard and to a subjective standard. He's clearly testified in his deposition that subjectively he was, and I submit to you under the totality of the facts and under the case law that has been litigated throughout the Ninth Circuit and other district courts or circuit courts, that this conduct that Brennan put him under rises to the level of actionable sexual harassment under Title VII. Now, while he was there, he was ‑‑ When did he first complain to Brennan's supervisor? That was on or around April 10th, Your Honor. How long had he been working there then? Approximately a month to five weeks. He reported that to Rick Welch, as was described in the record below, and then he was discharged on April 19th of 2000. Now, the reasons that the district court granted the motion for ‑‑ I'm just going to address sexual harassment at this point, and then I'll get to the retaliation claim. The district court used the test as articulated in Harris v. Forklift's system, and the court found one of the four factors present. It found that the frequency was high, but that the other factors, as articulated in Harris, weren't present. Now, one thing I want the court to bear in mind is that, remember, Brennan was doing this conduct to another coworker, Brett Warner, and Brett Warner found it offensive enough to report it to his supervisors. So not only do we have ‑‑ When did that activity take place? Your Honor, best we can tell from the record ‑‑ Was it the same time, or was it before, or was it after? Or do we know? Well, actually, Ms. Camara testified in his deposition that he saw Brennan do this to Warner on one occasion. We took the deposition, or the defense took the deposition of Warner, and he testified that it happened on many occasions. So we know it occurred concurrently with Ms. Camara's employee with Home Depot, but it probably occurred after. The actual complaint that Warner made was after Ms. Camara was discharged, but this conduct had been going on. So we have another employee who found almost the identical conduct that Ms. Camara was put under sufficiently problematic to report it to management. Remember, Warner was a longtime Home Depot employee. He had worked there somewhere six to nine years at different Home Depots throughout the Southwest before transferring to the new store in Las Vegas. So the district court found frequency, but it didn't find that the conduct was sufficiently severe or that it was physically threatening, humiliating, or that it might have been an offense of utterance or that it interfered with his performance. But that's belied, Your Honors, by the testimony of Ms. Camara. Ms. Camara is an older guy, late 30s, early 40s at the time. This wasn't a brand-new hire, and it was offensive to him. And it's detailed all throughout that it happened practically from the day he started at least up until he reported it to Work Welch. We don't really know if it occurred after that. Is offensive being good enough to get a case for a jury? It depends, Your Honor, as you're aware. It depends on the frequency. There's cases out there that talk about if the frequency is high but the conduct isn't as severe as one might want it to be or in terms of what other cases have held. If there's a lot of frequency, you can take it in a sort of inverse relationship. This was something that permeated practically daily existence there for Fred Ms. Camara. And so if you couple the two together, you have an actionable sexual harassment claim under Title VII. Was there any reaction by Welch, any action taken by Welch after the complaints were made to him? As far as Fred Ms. Camara knows, no. I mean, Welch never got back to him. Welch, the next thing he knew, he was being terminated. So as far as we know, nothing was done in terms of what was related back to Fred Ms. Camara. Now with respect to, Your Honors, I think some instructive language in terms of whether one presents a hostile work environment claim. And this is, I'm quoting from the case of Farragar v. City of Boca Raton. And the Court's agonizing about this distinction. What is something that is just differences between men and women which would not be actionable and conduct that is actionable sexual harassment? And this is what they say isn't. And this, I think, is very instructive on determining that the conduct here was sexual harassment. Genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and opposite sex would not be sexual harassment. Ordinary tribulations in the workplace such as sporadic use of abusive language, gender-related jokes, and occasional teasing would not be sexual harassment. In this case, I don't think any reasonable person could conclude that these conducts by Brannon was genuine and innocuous differences in the ways men and women routinely interact with members of the same sex or ordinary tribulations of the workplace such as sporadic use of abusive language, gender-related jokes, and occasional teasing. I gather the heart of your argument is that you've presented sufficient evidence on summary judgment that a reasonable trial of fact could find. That's correct, Your Honor. That's my position. This should at least go to a jury. You know, even the case cited by the defense, the Stokel case, the district court case, which they cite as saying, I did not address it, involved a bench trial. The plaintiff got to put on his evidence, and the finder of fact, after determining credibility of the witnesses and all the things that are attendant with the trial, found it wasn't sufficient. That's a big difference than striking someone's claim as a matter of law. So for those reasons, I think, and for the reasons I've cited, and all the other cases, practically speaking, that the defense has provided, are minimal incidents, incidents that occurred one time or in one day towards the plaintiff, not over the entire duration of one's employee. Now, with respect to Fred Mescamero's retaliation claim, we know what the standard is with that. Did he engage in protected activity? Is employers subject him to adverse employment action? Is there a causal link that exists between the protected activity? The district court did not find that one and two did not exist in that test. They're attacking, and they dismissed my claim because they state, or it stated, that there was no causal link that exists between the protected activity and the adverse action, namely employment. Remember, he reported to Rick Welch on or around April 10th. He was discharged April 19th. Now, the Vasquez case, which I cited in my brief, states that it incorporates this burden-shifting mechanism and shows that if the plaintiff can show, and I'm jumping right now to rebutting the legitimate business reason that the defendant offers, namely that there was a reduction in force, if the plaintiff can show a pretext by showing that discrimination more likely motivated by the employer or indirectly by showing that the employer's explanation is unworthy of credence, that's the test that is articulated in the Vasquez. And there's the facts that show pretext or honor is false. Temporal proximity. We have nine days from the date he reported this to the date he's discharged, number one. Number two? There's no question, is there, that there was a reduction in force. You're just arguing that they picked him. Correct, Your Honor. And I want to address the reduction of force argument now. I don't believe, though you may hear the defense argue this indirectly, a reduction in force doesn't emasculate one's sexual harassment or retaliation claim. I think they're going to try to argue that if there's a legitimate reduction of force, if you believe that there was a reduction in force, that that in and of itself emasculates one's claim for retaliation. I don't believe that's the law, Your Honor. You still look behind the reasons as to why the defendant was chosen. A RIF is not a per se defense. They may be able to show you that there was a RIF here, a reduction in force. What evidence is there, other than the inference you draw from it happening a week later, that they did do it as retaliation? Well, a couple things. One, we know from the conflicting testimony provided, and this is where Brent Warner becomes very important. Brent Warner, remember, was a longtime employee, and he had participated in reductions in forces on previous occasions. And he said on every occasion, Your Honors, that there was a reduction in force, that the department head was consulted. And, Your Honor, common sense requires that. Why on earth would you have a reduction in force where you pick individuals from departments? If you don't go to the person that has the best knowledge as to who is the least of the worst or least productive, it belies common sense that any reduction in force would occur. The defense has tried to portray that this RIF was done without Rene Brannan's participation or without Rick Welch's participation. Now, there's a conflict there because Mr. Welch testified he was part of it, and we know he was told of this conduct before the RIF occurred. But the fact is, so they've created something. I believe they've created, under the Vasquez case, a defense unworthy of credence through their own conflicting testimony. And Fred Miscamara's own qualifications apply. This is a brand-new story, Your Honor. This is a man who has started in an entry-level position with a bachelor's degree and 15 years of experience. And we have Brent Warner's testimony. Again, the experienced employee of Home Depot said there were a lot of other people that were a lot worse than he, and I described that in my brief extensively. Now, the other man who complained was not fired, was he? Brent Warner? Yeah. Well, I think he was, ultimately, but I don't represent him on that. I don't believe there's a claim for that. Well, there's nothing in the record that shows what happened to him. That's correct, Your Honor. I did not put that in. I put his in the record because it's probative on someone else complained about the conduct. That goes to whether an objective person would determine the conduct to be sufficiently severe and pervasive. And I also put Warner's testimony in there to show the qualifications, someone who's experienced with RIFs, and that Fred Miscamara was one of the better employees in there. And if he was, why was he chosen? There was an 18-year-old kid that was in there that Brent Warner referred to as a goof-off. There was another lady in there who did not work very hard, to put it mildly, and yet Fred Miscamara was chosen after he reported the sexual harassment. Did you want to save some time for rebuttal? Yes, I do, Your Honor. I think I am finished, and, yes, I would like to save the balance of my time for rebuttal. Thank you. Thank you. Good morning, Your Honors. My name is Mike Sexton. I represent Respondent Home Depot. Taking the claims in reverse order, I'd like to start with the retaliation because notwithstanding counsel's arguments and what is in the record and what is undisputed is that Larry Portelli, this is a supplemental excerpt to the record, made the decision to include Mr. Miscamara in the reduction in force, number one. Number two, Mr. Portelli, there is sworn declaration saying he didn't even know that Mr. Miscamara had ever complained to Ms. Brennan. There is a firewall. Would you mind keeping your voice up a little bit? Oh, I'm sorry, Your Honor. I know you're speaking into the... Okay. I've never been at the Ninth Circuit before. But the decision maker, the one who made the decision to include Mr. Miscamara, who made that decision to include him as one of the seven people selected for termination as part of the reduction in force, did not know, was not aware, that Mr. Miscamara had ever complained either to Ms. Brennan or to Mr. Welch. And there is no evidence to the contrary that Mr. Portelli, the one who actually made the decision, was ever aware that Mr. Miscamara had made the complaint. So with all due respect, the plaintiff's and Mr. Miscamara's argument with respect to whether our legitimate business reason, the reduction in force, again, there's no evidence that a reduction in force wasn't necessary. I think what Mr. Miscamara is saying is, why was I included? Why was I part of one of the seven? Again, the record is clear that one individual was selected from each department, including Mr. Miscamara's. And the decision, the factors that were used, according to Mr. Portelli and Mr. Young, both who submitted declarations in support of our summary judgment motion, were, as far as why individuals were selected for termination, were experience, performance, feedback from coworkers, background skills, and qualifications. And, again, you've got Mr. Miscamara's deposition testimony where he says he has no hardware experience. His experience, basically, with respect to hardware is working around the house, I believe his words were. I'm a guy. I sometimes work with power tools. And with all due respect, when the decision makers were making the decisions as to who was qualified, who had the experience, who demonstrated the performance, the fact that Mr. Miscamara had a college degree vis-a-vis the other factors that were used by those who made the decision for inclusion in the RIF simply didn't make the cut. And, again, most importantly, Mr. Portelli, who made that decision, had no knowledge. There is nothing in the record to suggest that there was any knowledge on the part of Mr. Portelli who made the decision or anyone else who was present that they knew that the complaint had been made. And, again, with respect to the retaliation claim, we believe that constitutes a virtual firewall, that you cannot by definition proffer the required specific and substantial evidence to demonstrate that the proffered reasons for inclusion in the RIF. I guess the theory of your opponent, as I understand it, is that it's not credible that somebody would stand off and select a person from each department without consulting with the people in that department. Well, yeah. Well, in this instance, Mr. Portelli was the acting store manager at the time of the RIF decisions. The assistant managers were all included in that decision-making. I think what Mr. Miscomero is saying is, according to Mr. Werner, who is an hourly associate and clearly not part of the decision-making team in this instance, said that when he worked in Arizona, when he was a department supervisor, that management would routinely include department supervisors in that selection process. But that's not what's happened here, and there's no evidence in the record that that's required. Turning to the claim for hostile work environment, again, this is not a quid pro quo sex harassment case. There's no evidence in the record of sexual advances. There's no evidence of requests for sexual favors. What you have, according to the Meritor Savings Bank, is one of the three required elements, verbal and or physical conduct of a sexual nature. That conduct, arguably unwelcome for limited purposes of the summary judgment motion. We conceded that it was unwelcome. But it's the third required element that Mr. Miscomero fails. Was it sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive working environment? That's the requirement of Meritor Savings. And the Harris v. Forklift case, Justice O'Connor set forth the required four factors. And, again, what we have are Mr. Miscomero's own sworn deposition testimony, which is part of the record, where he felt that he was embarrassed by it. He felt uneasy. He felt that it was silly. There is not one citation in the record before you that he was offended by this conduct. And even if he was offended, the third required factor under the Harris v. Forklift case is whether the conduct in question is physically threatening or humiliating and not merely an offensive utterance. So counsel's representation to the court notwithstanding, that third required element to determine whether or not the conduct in question was severe or pervasive is simply not present in the record before us. With respect to frequency, I think what's before the court in the record and what was before the district court was the verbal comments that were made, referring to Mr. Miscomero as a stud or a stud man or a big, strong man, I think were the words in the record. The verbal comments were made to Mr. Miscomero allegedly on a daily basis, but that was specifically not the case with respect to the physical conduct. According to the record, which is, again, I can cite the portions of it. I'm sure you're familiar with it. She touched his face, ran her fingers through her hair because there was sawdust in his hair apparently on one occasion, touched his chest three or four times, and according to Mr. Miscomero, Ms. Brennan rubbed up against him on three or four different occasions. So that's the frequency with respect to the physical conduct in question. And the Ellison v. Brady case, I think, is particularly instructive in this regard. You look to the perspective of the victim, and when you look at the excerpts of the record, which we've submitted, again, Mr. Miscomero, when asked whether he was offended, said he does not answer that question, and instead he says that it was embarrassing, he felt uneasy, and that when he actually talked to Ms. Brennan after the third time that it happened, again, it happens apparently on two occasions where he says nothing, and after the third time he walks up to Ms. Brennan and says, what's the deal? This is silly. That is in stark contrast, I would submit, to the required element that the victim feel that the conduct in question created an abusive working environment. The plaintiff in Ellison, as I'm sure you're aware, testified that she was shocked. So does the employee have to be subjected to some sort of psychological damage before he? No, I believe the case law is clear that it does not have to be. But, again, the fourth required element, that it has to be such severe or pervasiveness to alter the conditions of employment and create an abusive working environment, that's the standard. It doesn't require that the plaintiff seek out medical attention or psychological evaluation. But in this instance, after two occasions, after the second or third occasion, Mr. and Ms. Gamera walks up to Ms. Brennan and says, what's the deal? This is silly. I'm embarrassed by it. And when he ultimately complains to the assistant manager in a conversation which lasted less than two minutes, he didn't ask that Ms. Brennan be fired. He didn't ask to be transferred. He didn't ask Ms. Brennan to be transferred. He just felt that Ms. Brennan needed to be spoken with and that he was simply apprising Mr. Welch, the assistant manager, of the situation. In fact, there was a question in the excerpt of the record at page 27. Did you tell him, that's Mr. Welch, that you wanted her to stop doing what she was doing? And he answered that question, not in so many words. Did they ask him whether or not he wanted particular action taken? There's nothing in the record to suggest that Mr. Welch asked Mr. and Ms. Gamera what he wanted to do. I think the record is clear that the alleged complaint by Mr. and Ms. Gamera to Mr. Welch was simply apprising of the situation and making him aware of it and that he felt, Mr. and Ms. Gamera felt, that Ms. Brennan should be spoken with. But there's nothing in the record to suggest that Mr. and Ms. Gamera wanted to be transferred or wanted Ms. Brennan demoted or fired or, you know, the Home Depot has dozens of stores. Is there anything in the record that indicates that Welch did talk to Brennan about this? There's nothing in the record to suggest that Welch did anything with the complaint, quite frankly, other than receive it from Mr. and Ms. Gamera, and that when you look at the record, that's all basically Mr. and Ms. Gamera was asking Mr. Welch to do, was to speak with Ms. Brennan. Brennan did receive a counseling, and it came up after the complaint was made by Mr. and Ms. Gamera. Then they investigated it because, as Mr. Marchek has pointed out, Mr. Warner, a co-worker, also complained. And so they followed up with that complaint. And that, I believe, is also particularly instructive in that you've got to look at the perspective of the victim. Arguably, Mr. Warner and Mr. and Ms. Gamera were subjected to the same type of conduct. They both were referred to as studs or stud muffins or stud boys and touched and whatnot. Mr. Warner basically says, I'm writing this statement because I have to, and I don't want anything from Home Depot other than a fair shot at perhaps someday getting a store manager position. That's what's in the record. So that is the complaint that was made by Mr. and Ms. Gamera to Mr. Welch. And, again, the absolute firewall between that complaint to Mr. Welch, to the decision makers and the reduction in force some eight, nine days later precludes judgment or precludes the retaliation element of the case from going forward. Mr. and Ms. Gamera was also asked in his deposition, and it's an excerpt of the record at page 31, where if it had any effect on him, which is ultimately at the end of the day when it comes to hostile environment, at least on the third required element, what effect did it have on you at work? And the answer is no. I never missed a day of work. I always worked overtime whenever requested, and I was a solid employee. That is the testimony in the record, which I would submit as a matter of law. That demonstrates that this particular associate, Mr. and Ms. Gamera, is not suffering the type of required abusive working environment and that the terms and conditions of his employment are not so sufficiently permeated with sexual harassment such that he cannot continue his employment. That being said, I would, I guess, like to reserve the balance of my time unless the panel has any questions. All right. I just have a couple points and then I'll rest. Mr. Sexton, I think you misspoke. Could you be sure you're talking? All right. Sorry. Mr. Sexton mentioned in his opening, in his remarks at the very beginning, that Mr. Portelli consulted all the area managers. And I remember Welch was the area manager for department head, but that's not accurate. I don't think he really meant that. And I'll just read the record, and this is the excerpt of record page six. I do not, quote, I do not even recall Mr. Welch being present for our discussion about Ms. Gamera. Ms. Brannon played no part in our discussion or decision regarding the RIF and or the selection of employees to be terminated as part of the RIF. Well, what evidence is that Mr. Portelli knew anything about the complaint? Not. No evidence, is there? Well, he provides an affidavit where he talks about. Is there any evidence that he knew about it? No. No. I don't think so. I mean, according to what he says, his deposition has never been taken. No, that's to the record. Right. He, and again, it goes to this fundamental question of are you going to have a RIF when you don't consult the persons that are most knowledgeable about who should be let go. No, he could have looked at it and said, this guy's been here six weeks. We can get rid of him. He's just almost a temporary person. Your Honor, they were all started at or around the same time. This store, he started before the store even opened. None of these people had been there for very long. So the fact is, again, it just goes against common sense to suggest that a RIF occurred, that there wasn't some knowledge somehow by them, even though they wanted help. Even though you don't have any evidence of it. I have temporal proximity, Your Honor, in that. And I have common sense and I have Brent Warner's testimony that when RIFs are done, the department heads are always consulted. It just doesn't make sense. The second thing, Your Honor, I want to bring up is Mr. Sexton mentioned that he didn't miss any work. Well, because of the harassment. The fact is, if you look at the totality of the transcript, he talks at length about how it bothered him. Yeah, this is not someone who's going to call in sick because of something like this. That's not required. You'll find many of the cases that involve sexual harassment, a lot of the women don't call in sick. And there's actionable sexual harassment. That's not a requirement. The fact is, over and over again in his transcript, taken as a whole, in pages 90 through 122, if you want to look at those pages, clearly delineate how much it bothered him. And so for those reasons, Your Honor, I'm requesting that the court reverse and remand the district court's granting of summary judgment. One last thing. The court never even mentioned, the district court never even mentioned in the retaliation Warner's testimony. Never mentioned it. Do we omit addressing that very nagging fact about Brent Warner's testimony regarding a RIF? Thank you, Your Honor. Thank you. The matter will be submitted.
judges: Canby, Noonan, Paez